THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Case Number: 06-CR-21-01-RBW |
| : | |
| CINQUAN BLAKNEY, : | |
| : | |
| Defendant. : | |

**MOTION TO SUPPRESS THE AUDIO RECORDINGS
PROCURED PURSUANT TO TITLE III OF THE OMNIBUS CRIME CONTROL AND
SAFE STREETS ACT OF 1968 AND REQUEST FOR A FRANK'S HEARING**

COMES NOW THE DEFENDANT, CINQUAN BLAKNEY pursuant to Fed.R.Crim.P. 12(b)(3)(C); Fed.R.Crim.P 47 and 18 USC §2518(10)(a), through his court appointed attorney, Anthony D. Martin, and moves to suppress the audio recordings made pursuant to 18 USC §§2510, *et seq.* .

*Procedural Posture*

Defense pre-trial motions are due on October 26, 2007. The government's response is due on November 23, 2007. The Defense reply is due on December 14, 2007. A status conference is set for January 11, 2008. Argument on the motions has been set for March 3, 2008. Jury selection is set for March 11, 2008 and the trial is scheduled to begin on March 12, 2008. The trial is expected to last through the month of June 2008.

*Background*

CINQUAN BLAKNEY was arrested on January, 26th, 2006. Mr. Blakney has been in custody from the date of his arrest to the present and continuing. He is being held at the District of Columbia Jail. He has been charged in a multi-count indictment alleging violations of 21

USC §841 and 846, 18 USC §1519, and 18 USC §2510, *et seq*, *inter alia*.  A great deal of the evidence against Mr. Blakney is expected to take the form of audio recordings.

Mr. Blakney's arrest followed several months of investigation conducted by the "Safe Streets Task Force".   The task force was composed of law enforcement personnel from the Federal Bureau of Investigation and the Metropolitan Police Department.  It appears that the investigation was a spin off from an earlier investigation, where a great deal of information was learned about Mr. Blakney.  Indeed, that earlier investigation resulted in the indictment of several individuals.  The case was styled *United States v. Gerald Eiland;* and went to trial in March 2006.  Although within the scope of the investigation; Mr. Blakney was not indicted in the *Eiland* case.  The Eiland trial included several informants and cooperating witnesses; some of whom may give testimony in this case.

Traditional investigative methods were successfully used by the government in the *Eiland* case.  Some of those same investigative methods were also used in the case now before the court; including confidential sources and cooperating witnesses.  (*See, e.g*. Affidavit of Det Giannakoulias; January 2006 Bates No. SW 279; February 2006 Bates No. SW 294.)  In addition to the use of informants and cooperating witnesses in this case, the government used wires on the informants and camcorders to record drug sales with at least two of the alleged co-conspirators.  Despite the apparent availability of traditional investigative techniques and the progress of the investigation using methods not offensive to the 4th Amendment; the government agents sought wiretap authorization on Kevin Morris's phones as early as late September 2005.  Subsequent to the questionable monitoring of Mr. Morris's phones, authorization was sought to monitor phones thought to be used by Cinquan Blakney in November of 2005.  The same was granted by Judge Sullivan of this court on November 22nd, 2005.

*Argument*

**THE WIRETAPS WERE UNLAWFUL BECAUSE THE GOVERNMENT FAILED TO DEMONSTRATE IN THEIR APPLICATION FOR WIRETAPS THAT NORMAL INVESTIGATIVE TECHNIQUES WOULD HAVE BEEN SUFFICIENT TO EXPOSE THE ALLEGED CRIMINAL ACTIVITY.**

**A.  The Supporting Affidavits Repeatedly Make Reference to Other Investigative Tools That Were Successfully Used During the Investigation.  Those References Belie Any Claim that Title III Wiretaps Were Needed to Bring the Investigation to a Close.**

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.,* authorizes the district court to approve an application for the interception of certain wire, oral, or electronic communications. 18 U.S.C. § 2518. The wiretap statute requires that an application for a wiretap shall be in writing, under oath, and shall contain certain information including "a full and complete statement of the facts and circumstances relied upon by the applicant[ ] to justify his belief that an order should be issued." *Id.* § 2518(1). On the basis of the facts submitted by the applicant, the district court may authorize a wiretap upon finding that (1) probable cause exists to believe that an individual has committed or is about to commit one of certain enumerated offenses; (2) probable cause exists to believe that "particular communications concerning that offense will be obtained" through an interception; (3) "**normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried**"; and (4) probable cause exists to believe that the communication facility sought to be wiretapped "[is] being used, or [is] about to be used, in connection with the commission of [the] offense." S*ee United States v. Donovan,* 429 U.S. 413, 435, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977).

The determination that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. §

2518(3)(c), is referred to as the "necessity requirement," and it is the "keystone of congressional regulation of electronic eavesdropping." *United States v. Williams,* 580 F.2d 578, 587-588 (D.C.Cir.1978). In his November 22nd, 2005 affidavit submitted to J. Sullivan to justify the government's request for a wiretap authorization, special agent Scott Turner relied on boilerplate language. Beginning on page gage forty four (44) of the affidavit (Atch 1) he purports to lay out the failure or futility of more traditional investigative techniques in this case. In the very first sentence under the caption labeled "Physical Surveillance" Agent Turner concedes that there has been success using this method. He then qualifies that success by stating that it has only been limited. There is inadequate discussion regarding the limiting factors nor is there any discussion as to why "controlled buys" from targeted individuals would not have been sufficient to get a warrant to search the premises of one or all of the targets in turn. Proceeding in this fashion would clearly have been less intrusive than seeking a wiretap authorization.

Congress created the necessity requirement to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). To adhere to Congress's purpose, a court will "give close scrutiny" to a contested wiretap application and will "reject generalized and conclusory statements that other investigative procedures would prove unsuccessful."*Williams,*580 F.2d at 588. (Cf. *United States v. Sobamowo,* 892 F.2d 90, 93 (D.C.Cir.1989)(citing *United States v. Brown,* 823 F.2d 591, 598 (D.C.Cir.1987). Mr. Blakney is hopeful that the court will agree that the government has not met the congressional intent or heeded the caveat pronounced by the Supreme Court in *Kahn.*

*Conclusion*

The government has failed to satisfy the "necessity requirement" under Title III and as such the audio recordings and all fruits thereof should be suppressed.

*Prayer*

CINQUAN BLAKNEY requests that the court rule the audio recordings made pursuant to the wiretap application be ruled inadmissible.

*Request for Hearing*

The Defendant respectfully requests a hearing on the motion for discovery pursuant to *Franks v. Delaware,* 438 US 154 (1978).

Respectfully submitted,

Anthony D. Martin, Esquire

By: _____
ANTHONY D. MARTIN, 362-537
BELLE POINT OFFICE PARK
7841 Belle Point Drive
Greenbelt, MD 20770
(301) 220-3700; (301) 220-0791 (fax)

Attorney for Cinquan Blakney